Steven John Moser (SM1133)
Steven J. Moser, P.C.
3 School Street, Suite 207B
Glen Cove, New York 11542
(516) 671-1150 • F (516) 882-5420
smoser@moseremploymentlaw.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MARIE M. JOSIANNE SAJOUS, on behalf of herself and others similarly situated,

Case No.: 15-cv-3270

Plaintiff,

**COMPLAINT**

-against-

**JURY TRIAL DEMANDED**

SOUTHERN WINE & SPIRITS OF NEW YORK, INC.,
and WINE, LIQUOR & DISTILLERY WORKERS
LOCAL 1-D,

Defendants.

Plaintiff Marie M. Josianne Sajous, on behalf of herself and others similarly situated, through her attorney, Steven J. Moser, P.C., brings this action against Southern Wine & Spirits of New York, Inc., ("Southern") and Wine, Liquor & Distillery Workers Local 1-D (the "Union") and alleges as follows:

### NATURE OF CLAIMS

1.      Defendant Southern Wine & Spirits of New York, Inc. is a subsidiary of Southern Wine & Spirits of America, Inc., the nation's largest wine and spirit's distributor, which has yearly sales in excess of $10 Billion.    Southern operates a warehouse and distribution facility in Syosset, New York.    The Union is the collective bargaining representative of workers at the warehouse and distribution facility.    The Defendants have together systematically discriminated against women on the basis of their gender in job classification, compensation, promotion, and other terms and conditions of employment, in violation of Title VII of the Civil Rights Act of

1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII") and the New York State Human Rights Law, New York Executive Law§ 296 et seq. ("NYSHRL").

2.      Furthermore, the Defendants have had a policy of paying Female Inventory Control Clerks less than male warehouse employees performing substantially equal work in violation of the Equal Pay Act, 29 U.S.C. § 206 and the New York Labor Law § 194.

3.      There are two broad classifications of employees the warehouse and distribution center:  "warehouse" and "clerical" employees.   The overwhelming majority of "clerical" employees are females, while "warehouse" employees (typically referred to as "warehousemen") are males.   The Defendants thus maintain a segregated workforce based upon outdated stereotypes of "women's work" and "men's work."

4.      In fact, during the Plaintiff's employment with Southern, the Defendants maintained a "woman free" warehouse-classified staff.   As of January 12, 2014, all 149 warehouse-classified workers were men.

5.      The benefits of being a "warehouseman" include 2 ½ hours of guaranteed overtime per week, higher pay, eligibility for "top pay", and eligibility for special classifications which carry higher rates of pay.  These benefits are not available to workers classified as "clerical."

6.      Women are systematically channeled into "clerical" positions and are refused the "warehouse" classification.

7.      Accordingly, in addition to bringing this action on her own behalf, Plaintiff also brings this action on behalf of a class of similarly situated current and former employees of Southern ("the Class"), in order to end the discriminatory policies and/or practices alleged herein and to make the plaintiff class whole.

## CLASS ACTION ALLEGATIONS

8.      Plaintiff brings her Third, Fourth, Fifth and Six Claims as a Class Action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on behalf of a Class of all past, present, and future female employees of Southern.  Plaintiff reserves the right to amend the definition of the Class based on discovery or legal developments.

9.      Plaintiff is a member of the Class she seeks to represent.

10.     The members of the Class identified herein are so numerous that joinder of all members is impracticable.  As of the filing of this Complaint, Southern has approximately 40 or more female employees.  Although the precise number of female employees is currently unknown, it is far greater than can be feasibly addressed through joinder.

11.     There are questions of law and fact common to the Class, and these questions predominate over any questions affecting only individual members.  Common questions include, among others:  (1) whether the terms of the CBA I and CBA II, as hereinafter defined, and subsequent collective bargaining agreements have had a disparate effect on female employees; (2) whether the Defendants have had a policy and procedure of discriminating against women (3) whether Defendants have failed to implement policies and procedures to prevent discrimination against women in the workplace; (4) whether the Defendants' policies or practices violate Title VII and/or the NYSHRL; and (5) whether equitable remedies, injunctive relief, compensatory damages, and punitive damages for the Class are warranted.

12.     The Plaintiff's claims are typical of the claims of the Class.

13.     The Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has retained counsel competent and experienced in complex class actions, employment discrimination litigation, and the intersection thereof.

14.     Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because the Defendants have acted and/or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Plaintiffs and the Class as a whole. The Class members are entitled to injunctive relief to end the Defendants' common, uniform, unfair and discriminatory policies and practices.

15.     Class certification is also appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  The Class members have been damaged and are entitled to recovery as a result of Defendants' common, uniform, unfair, and discriminatory policies and practices.

## JURISDICTION AND VENUE

16.     This Court has original subject matter jurisdiction over the Title VII claims pursuant to 28 U.S.C. §§ 1331 and 1343, because they arise under the laws of the United States and are brought to recover damages for deprivation of equal rights.

17.     This Court has original subject matter jurisdiction over the Equal Pay Act (EPA) claims pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1343, and 29 U.S.C. § 216(b).

18.     In addition, this Court has supplemental jurisdiction over the NYSHRL and NYLL claims under 28 U.S.C. § 1367, because they arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims as to form part of the same case or controversy under Article III of the United States Constitution.

19.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3),  because the cause of action arose and the acts and omissions complained of occurred in this district.

20.     Plaintiff has exhausted her administrative remedies and complied with all statutory prerequisites to her Title VII claims.  Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 14, 2013.  By notice dated March 6, 2015, the EEOC dismissed Plaintiff's case and issued a Notice of Right to Sue.

21.     Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

### *Plaintiff*

22.     Ms. Sajous resides in Nassau County in the State of New York.

23.     Ms. Sajous is a female.

### *Southern*

24.     Defendants Southern Wine & Spirits of New York, Inc. is a foreign business corporation, formed under the laws of the State of Florida with authority to conduct business in the State of New York.

25.     Defendants Southern Wine & Spirits of New York, Inc. maintains a principal place of business in Syosset, New York.

26.     At all relevant times, Southern Wine & Spirits of New York, Inc. has had at least 200 employees.

27.     At all relevant times, Southern has continuously maintained several business locations throughout the State of New York, one of which is a warehouse and office complex in Syosset, New York in Nassau County.

28.     At all relevant times, Southern has continuously been an employer engaged in an industry affecting commerce within the meaning of the sections 203(b) and (h) of the EPA and 701(b)(g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

29.     At all relevant times, Southern has been an employer within the meaning of the NYSHRL § 292(5).

30.     At all relevant times, Southern has been an employer within the meaning of the NYLL § 190.

### Wine, Liquor & Distillery Workers Local 1-D

31.     Defendants Wine, Liquor & Distillery Workers Local 1-D is an unincorporated association and labor organization.

32.     The Union maintains a principal place of business at 8402 18th Avenue, Brooklyn, New York.

### FACTS

33.     Southern maintains an office located at 313 Underhill Blvd., Syosset, New York.

34.     Southern maintains a warehouse facility locate at 345 Underhill Blvd., Syosset, New York (the "Metro-New York Warehouse").

35.     Ms. Sajous was employed by Southern at 345 Underhill Blvd., Syosset, New York.

36.     The Union was the authorized collective bargaining representative of the Plaintiff and other Southern workers, and represented them in all employment matters, including wages and benefits.

37.     Ms. Sajous was a member of the Union.

38.     Upon information and belief, there was a collective bargaining agreement in effect from November 1, 2008 until October 31, 2011 between the Wine, Liquor & Distillery Workers' Union Local 1-D and Southern Wine and Spirits of New York, Inc. (CBA I).

39.     There also was a collective bargaining agreement between the Wine, Liquor & Distillery Workers' Union Local 1-D and Southern Wine and Spirits of New York, Inc. in effect from November 1, 2011 – October 31, 2014 (CBA II).  This collective bargaining agreement contained substantially the same terms and conditions as CBA I.

40.     Upon information and belief, CBA I and CBA II were the result of negotiations between the Union and Southern.

41.     The Union agreed to the terms of CBA I and CBA II.

42.     Southern agreed to the terms of CBA I and CBA II.

43.     Both CBA I and CBA II contained two broad classifications of workers: "warehouse" and "clerical."

### The Warehouse Classification Demographics and Pay

44.     As of January 12, 2014, all 149 warehouse-classified workers were men.

45.     The benefits of being the warehouse classification include 2 ½ hours of guaranteed overtime per week, higher pay, eligibility for "top pay", and eligibility for special classifications which carry higher rates of pay.

46.     Upon information and belief, during the Plaintiff's entire period of employment with Southern, the "warehouse classification" was only made available to men.

### *Inventory Control Clerks*

### *("Clerical" Employees)*

47.     Ms. Sajous was employed as an Inventory Control Clerk in the Inventory Control Department of the warehouse prior to the effective date of CBA I and during the effective dates of CBA II.

48.     Prior to February 17, 2009, the Inventory Control Department was 100% female and was comprised of the Plaintiff, Tatiana Herdocia (a Hispanic female), Ena Scott (a Black female), and Maria Suarez (a Hispanic female).

49.     Prior to February 17, 2009 all of the employees of the Inventory Control Department were classified as "clerical" employees under the CBA.

50.     On February 17, 2009 Southern added a single male to the Inventory Control Department by the name of Justin Veigh.

51.     According to Southern, due to a "clerical error", Mr. Veigh was originally classified as a "warehouse" worker.

52.     Southern later claimed to have corrected the "error" when Mr. Veigh's female co-workers discovered that he was classified as a warehouse worker and complained.

53.     Between February 17, 2009 and December 2013, the Inventory Control Department was 80% female, and consisted of four women and one male-Mr. Veigh.

54.     Inventory Control Clerks, as "clerical employees" were not eligible to receive the benefits of warehouse employees and were not eligible for Checker/Shipping & Receiving Clerk Pay.

### *Checkers/Shipping & Receiving Clerks*

### *("Warehouse" Employees)*

55.     Under section 9.3 of the CBA, a recognized "Warehouse" classification is "Checkers. Shipping & Receiving Clerks" (hereinafter referred to as "Shipping & Receiving Clerks" or "Checkers").

56.     All "Checkers/Shipping and Receiving Clerks" during the effective dates of CBA I and CBA II were males.

### *The Plaintiff, as an "Inventory Control Clerk", performed work substantially similar to that of her male "Checker/Shipping and Receiving Clerk" counterparts*

57.     The Plaintiff, as an "Inventory Control Clerk" (hereinafter "Inventory Control"), performed a job substantially similar to that of a "Checker/Shipping and Receiving Clerk", but received less pay.

### *Similar Skill*

58.     The Shipping & Receiving Clerk ("Checker") and Inventory Control Clerk jobs required similar experience, ability, education, and training.

59.      Ms. Sajous' Inventory Control Clerk job required, inter alia, the ability to conduct inventory counts, ability to carry up to 45 pounds, comfort with heights, physical ability to climb and maneuver around pallets, warehouse experience, and some college preferred [but not required].

60.     The Shipping & Receiving Clerk ("Checker") job, like other "warehouse-classified" positions requires, inter alia the "ability to conduct inventory counts, the ability to lift cases of product which weigh 35-45 pounds, familiarity with warehouse management systems

for tracking case volume and product placement within warehouse facility, previous distribution

center experience, and a minimum requirement of a high school diploma/GED."

61.     Ms. Sajous had to undergo periodic OSHA training courses on workplace injuries

and first-aid safety.

62.     Checkers had to undergo periodic OSHA training courses on workplace injuries

and first-aid safety.

63.     Ms. Sajous completed all of her safety training with warehouse employees, which

included Checkers.

64.     Ms. Sajous' was required her to obtain and maintain certification to operate

machinery such as "stand-up riders."

65.     The Checkers were required to obtain and maintain machinery such as "stand-up

riders."

*Similar Responsibility*

66.     The Shipping and Receiving Clerks and Inventory Control Clerks share similar

responsibilities and similar accountability.

67.     Ms. Sajous was responsible for maintaining and ensuring accurate inventory

records of product stored by Southern.

68.     Checkers are responsible for maintaining and ensuring accurate inventory records

of shipments received by Southern.

69.     Checkers physically inspect shipments received by Southern.

70.     Checkers compare the records of what is supposed to be in the shipment with the

actual product that is in the shipment.

71.     Checkers thus verify the accuracy of the shipment inventory.

72.     Once Checkers accurately conduct an inventory of shipments received by Southern, they are required to transmit information regarding the inventory to be received to Southern's accounting department.

73.     The accounting department then makes the appropriate accounting adjustment so that the records of the inventory held by Southern coincide with the physical product in inventory.

74.     Once items were received into inventory by the accounting department, Ms. Sajous was required to periodically conduct a physical inspection of the product.   See ¶ 61 above.

75.     Ms. Sajous compared Southern's records of what product is supposed to be in inventory with the actual product that is in the warehouse.  See ¶ 62 above.

76.     Ms. Sajous thus verified the accuracy of the inventory.   See ¶ 63 above.

77.     Once Ms. Sajous accurately conducted an inventory count she was required to transmit information regarding the inventory to Southern's accounting department.   See ¶ 64 above.

78.     The accounting department then makes the appropriate accounting adjustment so that the records of the inventory held by Southern coincide with the physical product in inventory.   See ¶ 65 above.

*Similar Effort*

79.     The Shipping and Receiving Clerk ("Checker") and Inventory Control Clerk jobs require similar physical and mental exertion.

80.     Checkers are required to lift cases of product when conducting an inventory of a particular shipment received.

81. Ms. Sajous was required to lift cases of product when conducting inventory in the warehouse.

82. Checkers physically count cases of product on a shipment.

83. Ms. Sajous physically counted cases of product in inventory.

84. Checkers must carefully read the labels on boxes and bottles to properly identify the product.

85. Ms. Sajous was required to carefully read labels on boxes and bottles to properly identify the product.

86. Checkers are required to maintain a focus and attention to detail.

87. Ms. Sajous was required to maintain a focus and attention to detail.

88. Checkers were required to count.

89. Ms. Sajous was required to count.

90. Checkers were required to use basic mathematical skills to accurately record the product located on a particular shipment.

91. Ms. Sajous was required to use basic mathematical skills to accurately record the product located in the warehouse.

*Similar Working Conditions*

92. The Shipping and Receiving Clerks ("Checkers") and Inventory Control Clerks share similar physical surroundings and are subject to the same hazards.

93. Checkers were required to be in the warehouse.

94. Ms. Sajous was required to be in the warehouse.

95. The inventory control department worked extensively alongside warehouse employees.

96.     Checkers are required to wear safety equipment such as steel-toed boots.

97.     Ms. Sajous was required to wear safety equipment such as steel-toed boots.

98.     Checkers, as warehouse workers, are subject to the risks of falling merchandise, falling from heights, the risks associated with operating equipment such as forklifts, and the risks of physical injury due to lifting.

99.     Ms. Sajous, in order to accurately track, locate, and confirm details of inventory in the warehouse, was subject to the risks of falling merchandise, falling from heights, the risks associated with operating equipment such as forklifts, and the risks of physical injury due to lifting.

100.    In fact, Ms. Sajous was required to wear safety equipment, which included but were not limited to miller harnesses, which are industrial-strength full body safety harnesses used to prevent injurious falls from high elevations.

101.    Checkers were required to complete OSHA safety trainings.

102.    Ms. Sajous was required to complete OSHA safety trainings.

103.    Because they were subject to the same risks, the Checkers and Ms. Sajous shared the same worker's compensation insurance classification.

### Pay Disparity Between The Plaintiff and

### Checkers/Shipping & Receiving Clerks

104.    Under the CBA, "Checkers. Shipping & Receiving Clerks" are guaranteed pay of no less than $1,175.20 per week as of Nov. 1, 2011 and $1,215.20 per week as of Nov 1, 2012.

105.    Ms. Sajous' regular hourly rate was $23.92 as of November 1, 2011, and $25.06 as of November 1, 2012.   Based upon her guaranteed workweek of 35 hours, her minimum guaranteed pay was $837.20 as of November 1, 2011, and $877.20 as of November 1, 2012.

106.     From November 1, 2011 until the Plaintiff's resignation in late 2013, Ms. Sajous'
minimum guaranteed weekly pay was $338.00 less than that of a Checker/Shipping and
Receiving Clerk.

### Southern's Refusal to Re-Classify the Plaintiff as a Warehouse Employee

107.     In or about May 2013 Ms. Sajous made a request to Southern to be classified as a
warehouse employee.

108.     Southern took no action with respect to this request.

109.     On or about July 10, 2013, Ms. Sajous met with her union representative, Ronald
"Ronnie" Riordan to inquire about filing a grievance against the company to have her
classification changed from clerical to warehouse.

110.     Ronnie served as shop steward for all members of the inventory control and
warehouse department.

111.     Ronnie responded that Ms. Sajous would not be able to do so and would have to
wait until CBA II expires in October 2014 to request a reclassification.

112.     Ms. Sajous had originally requested the warehouse classification in 2007.   At that
time, Ronnie discouraged her from requesting the warehouse classification and told her that she
only needed to wait until 2008, and that she would become "Union."

113.     Ronnie omitted the pertinent fact that under CBA I, Ms. Sajous would not be
classified as a "warehouse" employee.

114.     Ms. Sajous's again requested reclassification as a warehouse employee during the
negotiations for CBA II in or about September 2011.

115.     Ms. Sajous was informed after the effective date of CBA II that he had requested
that her classification be changed but that Southern refused.

116.    On August 8, 2013, the female staff of the inventory control department met with Human Resources representative, Dina Wald-Margolis, regarding the request for reclassification.

117.    In this meeting, Ms. Wald-Margolis admitted that the proper worker's compensation classification of the Inventory Control Clerks was "warehouse."

118.    Ms. Wald-Margolis also explained that Southern and the Union viewed the inventory control department as a "subset" of the warehouse, but not as performing a "warehouse function."

119.    Southern and the Union declined to reclassify the inventory control department as "warehouse" or define what a warehouse function was and how it excluded the inventory control department.

120.    Neither Southern nor the Union have provided any justification for the difference in pay for inventory control clerks and checkers.

121.    Neither Southern nor the Union have provided any explanation for the complete absence of females in warehouse classification.

122.    Upon information and belief, no female workers have been assigned a "warehouse" classification.

### Disparate Impact of the Collective Bargaining Agreements

123.    When Southern and the Union negotiated the terms of CBA I and CBA II they agreed to a facially neutral policy of reserving the highest-paid union jobs for "warehouse" employees.

124.    These highest paid union jobs, which are only available to "warehouse employees", include Forman, Console Operator, Checker/Shipping & Receiving Clerk, Machine

Operator, Maintenance Employee, and General Employee.   The pay for these workers far exceeds the compensation available to clerical employees.

125.     CBA I and CBA II categorically disallow "clerical employees" from the Forman, Console Operator, Checker/Shipping & Receiving Clerk, Machine Operator, Maintenance Employee or General Employee positions, regardless of the clerical employee's experience, skill, training, or abilities.

126.     Warehouse employees are also eligible for something called "top pay", which is reserved for the most senior employees.

127.     On its face, the CBA is not in and of itself discriminatory.   However, the CBA has disparate impact on females.   At the time CBA I and CBA II the Defendants agreed to terms that were much more favorable for men (the warehouse employees) than for women (clerical employees).

128.     Upon information and belief, at the time that CBA I and CBA II were negotiated, there was not a single female in the warehouse classification, and the clerical workers were almost exclusively female.

129.     CBA I and CBA II created artificial barriers to promotion and compensation to women which were afforded to men.

130.     For instance, the female inventory control clerks, who are as qualified as any warehouse employee to perform the functions of a Checker/Shipping & Receiving Clerk, are not eligible for said classification under the terms of the CBA I or CBA II.

131.     The CBA has had the effect of cementing disparities in pay between the male and female workforce at Southern.

132.     The CBA has had the effect of segregating the existing workforce based upon sex.

133.     The terms of the CBA have had the effect of perpetuating outdated gender-specific roles, of denying women at Southern equal pay to men, and of denying promotions and opportunities to women that have been made available to men.

134.     For instance, a warehouseman has the opportunity to be promoted to "Foreman." However, a clerical employee who is promoted becomes a supervisor and immediately loses her union status and benefits.

135.     The Defendants have systematically deprived women of the warehouse classification, resulting in an "All-Male" warehouse environment.

136.     Upon information and belief, women are generally "not welcome" in the warehouse.

137.     The Defendants consider work in the warehouse as "men's work."   Upon information and belief, a temporary agency once responded to a Southern request for workers by sending women to work in the warehouse.   These women were sent home the same day, and the temporary agency was thereafter instructed only to fill temporary warehouse positions with men.

**FIRST CLAIM FOR RELIEF**

Discrimination in Violation of the Equal Pay Act, 29 U.S.C. § 201, *et seq.*

138.     Plaintiff incorporates by reference all allegations in all preceding paragraphs as if fully alleged herein.

139.     Defendants discriminated against Plaintiff on account of her sex in violation of the Equal Pay Act.

## SECOND CLAIM FOR RELIEF

### Discrimination in Violation of NYLL § 194

140.    Plaintiff incorporates by reference all allegations in all preceding paragraphs as if fully alleged herein.

141.    Defendants discriminated against Plaintiff on account of her sex in violation of New York Labor Law § 194.

## THIRD CLAIM FOR RELIEF

### Intentional Discrimination

(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq.)

142.    Plaintiff incorporates by reference each allegation of each preceding paragraph.

143.    Defendants have intentionally maintained a system that discriminates on the basis of gender with respect to job classification, placement, compensation, promotion, and other terms and conditions of employment.

144.    Defendants have intentionally discriminated against Plaintiff and other females in violation of Title VII by, among other things:

      (a)  denying them the warehouse classification;

      (b)  denying them promotion opportunities because of their gender;

      (c)  denying them other opportunities for advancement because of their gender;

      (d)  denying them opportunities for increased compensation because of their gender;

      (e)  providing them with less favorable compensation because of their gender;

      (f)  providing disparate terms and conditions of employment because of their gender; and

(g) failing to examine their workplace to correct gender-biased and discriminatory policies and failing to address problems of disparate treatment on the basis of gender.

145.     The foregoing conduct constitutes illegal, intentional discrimination prohibited by 42 U.S.C. §§ 2000e et seq.

## FOURTH CLAIM FOR RELIEF

Disparate Impact Discrimination

(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq.)

146.     Plaintiff incorporates the preceding paragraphs as alleged above.

147.     The Defendants have maintained a system and/or policies that are discriminatory with respect to the assignment of employees to employment positions, promotions, compensation, and other terms and conditions of employment.

148.     The terms of the Collective Bargaining Agreements have had and continue to have a discriminatory impact on female employees.

149.     The Defendants have further cemented disparity between men and women through the terms of the Collective Bargaining Agreements, which includes disparity in employment positions, promotions, compensation, and other terms and conditions of employment.

150.     This system has an adverse impact on female employees and is not, and cannot be, justified by business necessity.  Even if such system could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

151.     The foregoing conduct constitutes illegal discrimination prohibited by 42 U.S.C. §§ 2000e et seq.

## FIFTH CLAIM FOR RELIEF

Intentional Discrimination

(NYSHRL, New York Executive Law§ 296 et seq.)

152.    Plaintiff incorporates by reference each allegation of each preceding paragraph.

153.    Defendants have intentionally maintained a system that discriminates on the basis of gender with respect to job placement, compensation, promotion, and other terms and conditions of employment.

154.    Defendants have intentionally discriminated against Plaintiff and other females in violation of the NYSHRL by, among other things:

(a)  denying them the warehouse classification;

(b)  denying them promotion opportunities because of their gender;

(c)  denying them other opportunities for advancement because of their gender;

(d)  denying them opportunities for increased compensation because of their gender;

(e)  providing them with less favorable compensation because of their gender;

(f)  providing disparate terms and conditions of employment because of their gender; and

(g)  failing to examine their workplace to correct gender-biased and discriminatory policies and failing to address problems of disparate treatment on the basis of gender.

155.    The foregoing conduct constitutes illegal, intentional discrimination prohibited by New York Executive Law § 296 et seq.

## SIXTH CLAIM FOR RELIEF

Disparate Impact Discrimination

(NYSHRL, New York Executive Law§ 296 et seq.)

156.    Plaintiff incorporates the preceding paragraphs as alleged above.

157.    The Defendants has maintained a system and/or policies that are discriminatory with respect to the assignment of employees to employment positions, promotions, compensation, and other terms and conditions of employment.

158.    The terms of the Collective Bargaining Agreements have had and continue to have a discriminatory impact on female employees.

159.    The Defendants have further cemented disparity between men and women through the terms of the Collective Bargaining Agreements, which includes disparity in employment positions, promotions, compensation, and other terms and conditions of employment.

160.    This system has an adverse impact on female employees and is not, and cannot be, justified by business necessity.  Even if such system could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

161.    The foregoing conduct constitutes illegal discrimination prohibited by the New York State Human Rights Law.

162.    The foregoing conduct constitutes illegal discrimination prohibited by New York Executive Law § 296 et seq.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter an award:

A.       Declaring that the acts and practices complained of herein are in violation of Title VII;

B.       Declaring that the acts and practices complained of herein are in violation of NYSHRL § 296;

C.       Enjoining and permanently restraining these violations of Title VII and the NYSHRL; and directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

D.       Awarding Plaintiff and the Class compensatory damages in amounts to be determined at trial;

E.       Awarding Plaintiff liquidated damages for lost wages, in amounts to be determined at trial;

F.       Awarding Plaintiff punitive damages for Defendants' conduct, in amounts to be determined at trial;

G.       Awarding Plaintiff liquidated damages under the EPA and the New York Labor Law;

H.       Awarding Plaintiff such interest as is allowed by law;

I.       Awarding Plaintiff reasonable attorneys' fees and costs incurred in this action; and

J.       Granting such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: Glen Cove, New York
June 4, 2015

Respectfully submitted,
STEVEN J. MOSER P.C.

/s/_____
By:  Steven John Moser
3 School Street, Suite 207 B
Glen Cove, New York  11542
(516) 671-1150
F (516) 882-5420
smoser@moseremploymentlaw.com
*Attorney for Plaintiff*